**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **MICHELLE BLAIR** | ) |
| | ) |
| **Plaintiff,** | ) **Civ. Action No.** |
| | ) |
| **vs.** | ) **VERIFIED DERIVATIVE** |
| | ) **COMPLAINT FOR BREACH** |
| **LEE N. BLATT, MYRON LEVY, DR. EDWARD** | ) **OF FIDUCIARY DUTY** |
| **A. BOGUCZ, CARLOS CAMPBELL, EDWARD** | ) |
| **K. WALKER, JR., ROBERT M. MOORE, and** | ) **JURY TRIAL DEMANDED** |
| **JOHN A. THONET,** | ) |
| | ) |
| **Defendants,** | ) |
| | ) |
| **AND** | ) |
| | ) |
| **HERLEY INDUSTRIES INC., a Delaware** | ) |
| **Corporation,** | ) |
| | ) |
| **Nominal Defendant.** | ) |
| | ) |

## NATURE OF THE ACTION

1.      This is a shareholder derivative action brought on behalf of Herley Industries,

Inc. ("Herley" or the "Company") to recover for damages caused to the Company by the

Defendants' breaches of fiduciary duty owed to the Company and its shareholders.

2.      As detailed herein, Defendants intentionally or recklessly ignored repeated,

clear, and unmistakable warnings that the Company and its co-founder and former

Chairman of the Board, Lee N. Blatt ("Blatt"), engaged in a course of conduct commencing

in 2001 to defraud the U.S. government by, *inter alia*, fabricating manufacturing costs on

three contracts with the U.S. Department of Defense.  On June 6, 2006, the U.S. indicted

Herley and Blatt on multiple charges in connection with their illegal scheme.  On June 13,

2006, Herley announced that its operations in four of its facilities were suspended from receiving new contracts awards from the U.S. government.

3.      Defendants' improper conduct has caused and will continue to cause serious damage to Herley and its public shareholders, including, *inter alia*, the loss of lucrative new government contracts, the loss of its reputation and goodwill, the costs of defense of the indictment and the costs associated with the numerous shareholder class action lawsuits filed against Herley and its senior officers.

## JURISDICTION AND VENUE

4.      This derivative action is brought pursuant to Rule 23.1 of the Federal Rules of Civil Procedure.

5.      The Nominal Defendant, Herley, is a Delaware corporation with its principal executive office in this District.  Plaintiff is a resident of Kansas.  The defendants are residents of states other than Kansas.

6.      This Court has diversity jurisdiction over this action pursuant to 28 U.S.C. §1332.  The amount in controversy exceeds $75,000, exclusive interest and costs.

7.      This action is not brought collusively to confer jurisdiction on this Court which it would not otherwise have.  Herley is headquartered in this District, and the Company and the Defendants are subject to personal jurisdiction in this District.  Venue is proper in this District because some or all of the events, actions, and failures to act giving rise to the claims asserted herein occurred in this District.

## PARTIES

8.     Plaintiff Michelle Blair, has been at all times relevant to this action, the owner of shares of the common stock of Herley.

## DIRECTOR DEFENDANTS

9.     Defendant Lee N. Blatt ("Blatt") is the co-founder of Herley.  Up until his resignation on June 8, 2006, Blatt was Chairman of the Board of Directors of Herley and has been since 1993 a director of the Company.  Herley was indicted by the U.S. government in an indictment filed on June 6, 2006 in this Court, Criminal Docket #:2:06-cr-00268-LS-ALL ("the Indictment").  During the period of criminal conduct alleged in the Indictment, Blatt sold 48,000 shares of his personal shares of Herley common stock, reaping illegal insider profits.  Blatt has been a trustee of Syracuse University since 2002.  Blatt has established scholarships at Syracuse University, one of which directly benefits the School of Engineering and Computer Science.  Blatt and his wife gave over $1 million to Syracuse University between July 1, 2004 and June 30, 2005.

10.     Defendant Myron Levy ("Levy") is and has been a director of Herley since 1992.   Levy was named Chairman in June, 2006 and has held the position of Chief Executive Officer since August 2001 after serving as President since June 1993, Executive Vice President and Treasurer since May 1991 and as Vice President for Business Operations and Treasurer since joining Herley in October 1988.  Levy also serves on the Board of Directors for NetWolves Corporation, a NASDAQ listed company.

11.     Defendant Dr. Edward A. Bogucz ("Bogucz") is and has been a director of Herley since March 2003.  From 1995 through 2003, Bogucz was the Douglas D. Danforth

Dean of Engineering and Computer Science at Syracuse University.  Currently, Bogucz is the Executive Director of Syracuse University's Center of Excellence in Environmental Systems.  Bogucz serves on Herley's Compensation and Audit Committee.

12.     Defendant Carlos Campbell ("Campbell") has been a director of the Company since January 2005.  Campbell currently operates a consulting business in Reston, Virginia and serves on the Board of Directors for Resource America, Inc. and Pico Holdings, Inc. Campbell also serves on the Board of Directors for NetWolves Corporation along with Defendant Levy.  Both NetWolves Corporation and Pico Holdings, Inc. are NASDAQ listed companies.  Campbell serves on the Board of Directors for the Board of Advisors for Passport Health, Inc.

13.     Defendant Admiral Edward K. Walker, Jr. (Ret.) ("Walker")  has been a director since October 1997.  Since his retirement from the United States Navy in 1988, Walker had been the Director of Corporate Strategy for Resource Consultants, Inc., a privately held corporation supporting the Department of Defense, and other government agencies.  In March 2005, Serco acquired Resource Consultants, Inc. and Walker now holds the position of Vice President Emeritus, serving as senior adviser for a number of Department of Defense and U.S. Navy Programs.   Walker serves on Herley's Compensation and Audit Committees.

14.     Defendant Admiral Robert M. Moore (Ret) ("Moore") has been a director since 2003.   Moore is a retired Rear Admiral, U.S. Navy and serves on Herley's Compensation and Audit Committees.

15.     Defendant John A. Thonet ("Thonet") has been a director since 1991 and president of Thonet Associates, an environmental consulting firm specializing in land planning and zoning matters.  Thonet is the son-in-law of Defendant Blatt.

16.     Defendant Herley, a Delaware corporation, maintains its principal executive offices at 101 North Pointe Boulevard, Lancaster, Pennsylvania 17601.  Herley engages in the research, engineering, development, and manufacture of microwave radio frequency, and millimeter wave components and subsystems for defense and commercial customers worldwide.  Among the components supplied by Herley were a voltage controlled oscillator used by the Air Force in its F-16 fighter jet radar system and a Power Head used by the Navy in its E2-C planes stationed on aircraft carriers.  Contracts with the U.S. government contribute approximately 25% of Herley's annual revenues.

## SUBSTANTIVE ALLEGATIONS

17.     During the period commencing approximately April 2000 and continuing through until approximately December 2002, Herley and Blatt engaged in "a scheme to defraud the U.S. government and one of its prime contractors, Lockheed Martin, and to obtain money and property, that is approximately $3,934,203, by means of false and fraudulent pretenses, representations and promises."  Indictment, ¶21.

18.     The illegal course of conduct permeated Herley, involving four major facilities in Lancaster, Pennsylvania, Woburn, Massachusetts, Chicago, Illinois and Farmingdale, New York and three major U. S. Government contracts involving voltage controlled oscillators and Power Heads.  The equipment manufactured and sold by Herley were critical components of the F-16 fighter jet radar systems and E-2c Hawkeye aircraft and

were components manufactured only by Herley.  Thus Herley was the only company from which the Air Force could buy VCO's and from which the Navy could buy Power Heads.

19.     Government purchase contracts, including those by the military, were governed by federal procurement regulations, called the Federal Acquisition Regulations (or the "FAR").

20.     Where there was one supplier of a product (so-called "sole-source" procurements), the military did not engage in a competitive bidding process, but rather initiated its procurement by soliciting a bid directly from the supplier.

21.     For each contract at issue in this indictment, the military used a typ of contract known as a "firm fixed price contract."  Under a firm fixed price contract, for the entire term of the contract, the price to be paid for the product is fixed at the time the parties enter the contract: changed circumstances which increase or decrease costs will not change the contract purchase price, that is, the contract price is settled (firm) and unchanging (fixed).

22.     The contracting process for a firm fixed contract between the military and a sole source supplier was as follows:  A civilian employee of the Navy or Air Force with procurement responsibilities (sometimes called a "contracting officer") issued a request for a proposal ("RFP"), which solicited a quotation or bid from Herley for the needed product. In the procurements at issue here, the employee sent that RFP to the Herley division that purchased the VCO's or the Power Heads.  In response, if Herley wanted the contract, its division would submit a quotation for the solicited product.  With its quotation, the military required Herley to submit a cost breakdown, that is, an explanation and justification of the

6

quotation Herley gave the military, as well as a cover sheet, called the Standard Form ("SF") 1411.

23.     Federal regulations required that the quotation and analyses submitted by a bidder such as Herley were to be based on the company's prior experience, modified, if necessary, by any changed circumstance or reasonably believed likely changed circumstance, that is, by reasonable estimates.  The contractor's prior experience was called its "historical" data.

24.     From April 2000 through in or about December 2002, Defendants were aware or should have been aware that Blatt dictated the amount of the fraudulent quote and support used to justify it, that Blatt dictated that Defendant Herley represent that obsolescence required a new manufacturing process, that Blatt dictated an amount of a fraudulent quotation for the part to be purchased intra-company and that as a result of Herley's selling these products at vastly increased prices and using the same parts and methods to manufacture it had always had used, Herley had profit in excess of 250% of its costs on one component and 300% on another.

25.     In 2001 during an audit of the Company, the Department of Defense found some discrepancies in Herley's prices for VCO's and Power Head.

26.     In a pre-award audit, the government's auditors reviewed the bid proposal submitted by the contractor against the contractor's historical data, and examined the reasonableness of the contractor's estimates, as well as any other assumptions which it had incorporated into its bid.  The pre-award audit served to ensure that, even though there was no competition for the contract, the bid price was reasonable and justified on the basis

of past experience (historical data).  The auditor typically gave an initial oral summary of his or her findings to the procurement specialists, and later issued a final report.

27.     After the pre-award audit, the parties entered into final negotiations.  One of the responsibilities of the military's negotiator, the contracting officer, was to determine whether the company's anticipated profits were reasonable in light of the relative risk taken in entering into the contract.

28.     When the parties reached agreement, whether oral or in writing, about the terms of the contract, the contractor's negotiator sent a confirming letter setting forth the agreed-upon price.  At the same time, the contractor executed and presented to the government with this confirming letter a Certificate of Current Cost and Pricing Data.

29.     The military required the contractor under a sole source contract of over $500,000 to sign a Certificate of Current Cost and Pricing Data.

30.     The Certificate of Current Cost and Pricing Data, like the SF 1411, attested that the information supplied by the contractor, on the basis of which the military negotiated the contract price, was current, accurate and complete.  It provided:

> This is to certify that, to the best of my knowledge and belief, the cost or pricing data...submitted, either actually or by specific identification in writing, to the contracting officer or the contracting officer's representative in support of [the solicitation] are accurate, complete and current as of [date of agreement].

31.     Defendants were aware of the importance of being honest and providing accurate information in order to be awarded government contracts.

32.     Throughout the period of time from 2000 through June 5, 2006, defendants took no action to remedy the illegal conduct or to discipline or take any action against those persons at Herley who participated in the illegal conduct.  The Directors also signed

8

Herley's SEC Forms 10-K throughout this period in which they failed to disclose the illegal conduct and falsified the many statements in the SEC Forms 10-K concerning Herley business operations and financial condition.  The false and misleading SEC Forms 10-K were filed for the fiscal years 2001 through 2005.

## THE BOARD VIOLATES ITS FIDUCIARY DUTIES

### A.    Defendants' Duties to Herley and its Shareholders

33.    Defendants, by reason of their positions as the directors of the Company, and in accordance with applicable law, have a fiduciary duty to act in good faith in controlling, managing, overseeing and directing the business, operations and management of Herley to insure that their operations and activities are in full compliance with federal and state laws and regulations, under which the Company operate.  Defendants, by reason of their knowledge and recklessness, as alleged herein, failed to act in good faith throughout the period of the wrongdoing engaged in by the Company and the Chairman of the Board of Directors of Herley, as alleged herein and in the Indictment, and permitted the illegal and fraudulent conduct to continue over a period of years and to go undisclosed and unremedied for a longer period of years

34.    Defendants were and are required to exercise reasonable and prudent supervision over management and the policies, practices, controls, and financial affairs of the Company pursuant to their fiduciary duties of due care, loyalty and good faith. Specifically, defendants were and are required, among other things:

(a)    to, reasonably and in good faith, manage, conduct, supervise, and direct the business and affairs of Herley carefully and prudently, and to ensure that the

9

business of Herley was conducted within the bounds of the law and in accordance with applicable laws and the Company's own corporate governance system;

(b)     to neither violate nor intentionally or recklessly permit any director, officer or employee of Herley to commit criminal acts in the conduct of the business of Herley;

(c)     to ensure that Herley had in place reasonable and effective systems and controls regarding to prevent or reveal illegal criminal conduct in the conduct of the business of Herley.

**B.     Knowledge of the Board**

35.     As directors of the Company, Defendants had specific guidelines for its oversight as set forth in the Company's proxies, SEC filings and corporate governance provisions.

36.     In addition, as sophisticated business people with extensive executive and management experience in publicly traded companies and in the defense industry, defendants were each aware of basic concepts of internal controls as applied to complex business organizations, as well as of the importance of adequate and effective systems to ensure corporate compliance with applicable laws and regulations.

37.     As a matter of corporate governance in connection with board meetings, management would normally report to the Board information concerning the government contracts which formed a critical part of Herley's business and to demand and receive accurate reports from Blatt in connection with his activities in directing the business of Herley.  The Directors had direct access to and regular contact with Blatt who, defendants knew, took an active role in conducting the day-to-day business operations of Herley,

particularly in the connection with Herley's government contracts, as detailed in the Indictment.

38.    The Audit Committee of Herley's Board has, among its principal functions, the responsibility to monitor the Company's compliance with legal and regulatory requirements and to review, on a continuing basis, the adequacy of the Company's system of internal controls, including meeting periodically with the Company's management and the independent auditors  The Audit Committee's Charter specifies that it shall be comprised of independent directors, as such is defined by NASDAQ rules and any rule or regulation prescribed by the SEC, free from any relationship that would interfere with the exercise of his or her independent judgment.

## C.    Knowledge of General Standards of Internal Control and Corporate Compliance

39.    Although issues of internal control and corporate compliance had received extensive congressional, regulatory, industry and public attention in the 1970s and 1980s, in the early 1990s, two developments directly pertaining to organizational governance clearly and unambiguously established the crucial responsibilities of corporate directors in these critical areas, namely the United States Sentencing Commission guidelines, and the Committee of Sponsoring Organizations of the Treadway Commission ("COSO") published "Internal Control – Integrated Framework" ("COSO Framework").

40.    First, pursuant to the Sentencing Reform Act of 1984, in 1991 the United States Sentencing Commission adopted the Organizational Sentencing Guidelines (the "Sentencing Guidelines").  The Sentencing Guidelines set forth a uniform structure for sentencing organizations for violations of federal criminal statutes, creating powerful

incentives for corporations to have in place effective compliance programs, and establishing minimum criteria for evaluating such programs.

41.     The Sentencing Guidelines have garnered widespread support and recognition.  In order to attend in good faith to their fiduciary responsibilities, directors must take into account the Sentencing Guidelines for corporate compliance programs.

42.     Among the minimum criteria for an effective compliance program under the Sentencing Guidelines are:

●       standards and procedures to be followed by employees and other agents that are reasonably capable of reducing the prospect of illegal conduct;

●       assignment of overall responsibility to oversee compliance with such standards and procedures to high-level personnel;

●       utilization of monitoring and auditing systems reasonably designed to detect illegal conduct by employees and other agents;

●       having in place a reporting system whereby employees and other agents could report illegal conduct without fear of retribution;

●       consideration of the likelihood that certain offenses may occur because of the nature of the company's business;

●       consideration of the prior compliance history of the company; and

●       ensuring that the company's compliance program incorporates and follows standards called for by any applicable government regulation.

43.     These explicit criteria support the common-sense proposition that directors, in performing their compliance oversight function, must satisfy themselves that the corporation's compliance program is appropriately designed to address the compliance risks arising from the nature of the company's business and its specific compliance history, and must ensure that the company employs a system of monitoring and auditing that will

provide them with reasonable assurance that the compliance program is in fact operating effectively.

44.     Second, in 1992, COSO published the COSO Framework that provides a broad framework of criteria against which companies can evaluate the effectiveness of their internal control systems.  The COSO Framework became the basis for many existing rules, regulations and laws, and, most recently, was recognized by the SEC (in its final rule regarding Management's Reports on Internal Control Over Financial Reporting and Certification of Disclosure in Exchange Act Periodic Reports, IC-26068) as the only currently existing internal control evaluation criteria satisfying the SEC's evaluative standard requirement applicable in the United States.

45.     Highly relevant to the degree of respect and deference given to the COSO Framework was the expansive and multi-disciplinary nature of the input, review and assessment reflected in its creation.  Specifically, the COSO Framework solicited the views of a broad base of corporate executives, legislators, regulators, academics and auditors. In addition, an exposure draft was widely released, and comments were received, considered and processed in arriving at the final version.

46.     The COSO Framework defines internal control as "a process, effected by an entity's board of directors, management and other personnel, designed to provide reasonable assurance regarding the achievement of objectives" in three categories: (i) effectiveness and efficiency of operations; (ii) reliability of financial reporting; and (iii) compliance with applicable laws and regulations.  COSO further states that internal control consists of five components:

●   *Control Environment* -- The core of any business is its people -- their individual attributes, including integrity, ethical values, and competence -- and the environment in which they operate.  They are the engine that drives the entity and the foundation on which everything rests.

●   *Risk Assessment* -- The entity must be aware of the risks it faces.  It must set objectives, integrated with the sales, production, marketing, financial and other activities so that the organization is operating in concert.

●   *Control Activities* -- Control policies and procedures must be established and executed to help ensure that the actions identified by management as necessary to address risks to achieve the entity's objectives are effectively carried out.

●   *Information and Communication* -- Surrounding these activities are information and communication systems.  These enable the entity's people to capture and exchange the information needed to conduct, manage and control its operations.

●   *Monitoring* -- The entire process must be monitored, and modifications made as necessary.  In this way, the system can react dynamically, changing as conditions warrant.

47.   The COSO Framework contains separate chapters addressing each internal control component.  Each chapter concludes with a section concerning evaluation of the effectiveness of the relevant internal control component and gives illustrative examples of key inquiries to be made by the evaluator.  Highlights of these illustrative examples include:

●   *Control Environment* -- To what extent is there pressure to meet unrealistic short-term performance targets and to what extent is compensation based on achieving them?  To what extent is the board or audit committee independent of management?  To what extent is sufficient and timely information provided to the board or audit committee?

●   *Risk Assessment* -- Are mechanisms to identify risks arising from external sources adequate?  Are mechanisms to identify risks arising from internal sources adequate?  Is the risk analysis process, including estimating the significance of risks, assessing the likelihood of their occurring and determining needed actions, adequate?

●   *Control Activities* -- Have appropriate policies and procedures been designed and implemented relative to the risks identified and assessed in the risk assessment process?

14

● *Information and Communication* -- Is information provided to the right people in sufficient detail and on time to enable them to carry out their responsibilities efficiently and effectively?  Have channels of communication been established for people to report suspected improprieties?

● *Monitoring* -- Are internal audit activities effective?  Is the entity responsive to internal and external auditor recommendations on means to strengthen internal controls?

48.     Most importantly, the COSO Framework recognizes that: "an active and involved board of directors . . . possessing an appropriate degree of management, technical and other expertise coupled with the necessary stature and mind set so that it can adequately perform the necessary governance, guidance and oversight responsibilities . . . is critical to effective internal control."  One key environmental factor that creates a temptation for employees to engage in improper acts is "[a]n ineffective board of directors that does not provide objective oversight of top management."  Moreover, "an unassertive or ineffective board or audit committee can provide opportunities for indiscretions."

49.     The COSO Framework also states that the duty of a company's CEO, who has "ultimate ownership responsibility for the internal control system," is to ensure that "all of the components of internal control are in place," and that "the CEO [is] ultimately accountable to the board."  The board itself must satisfy itself that the internal control system is reasonably designed and operates effectively.  The COSO Framework states that "[e]ffective boards and audit committees [must] determine whether the internal control system has the necessary critical underpinnings," that "[m]embers of the board should discuss with senior management the state of the entity's internal control system[,] provide oversight as needed[, and] seek input from the internal and external auditors," and that the "audit committee, in conjunction with or in addition to a strong internal audit function, is

15

often in the best position within an entity to identify and act in instances where top management overrides internal controls or otherwise seeks to misrepresent reported financial results."

50.     The COSO Framework further provides that:

Management is accountable to the board of directors or trustees, which provides governance, guidance, and oversight.  By selecting management, the board has a major role in defining what it expects in integrity and ethical values, and can confirm its expectations through its oversight activities. Similarly, by reserving authority in certain key decisions, the board can play a role in high-level objective setting and strategic planning, and with the oversight that the board provides, the board is involved pervasively in internal control.

Effective board members are objective, capable, and inquisitive.  They have working knowledge of the entity's activities and environment and commit the time necessary to fulfill their board responsibilities.  They should utilize resources as needed to investigate any issues they deem important, and have an open and unrestricted communications channel with all entity personnel, including the internal auditors, and with the external auditors and legal counsel.

51.     One of the basic concepts set forth in the COSO Framework -- and perhaps the most crucial in terms of highlighting the necessity of active involvement and oversight by a company's directors -- is that internal controls may be circumvented by management:

The term "management override" is used here [in the COSO Framework] to mean overruling prescribed policies or procedures for illegitimate purposes with the intent of personal gain or an enhanced presentation of an entity's financial condition or compliance status. . . . [A]ctions to override usually are not documented or disclosed, with an intent to cover up the actions.

52.     Thus, the COSO Framework repeatedly emphasizes the critical importance of the role of directors, functioning in an audit committee or as the full board, in conjunction with a strong internal audit function, to identify and act in instances where top management overrides internal controls.  It identifies management override as one instance in which the

16

"audit committee or board must carry its oversight role to the point of directly addressing serious events or conditions."

**D.**     **Defendants Abdicate Their Responsibilities**

53.     Armed with knowledge of or access to the facts concerning the Company's government contracts, the Company's illegal conduct and Blatt's role, the Directors did not, over the continuing period of time from 2000 to June 2006, take any effective steps to ensure that Herley's government contract business was conducted in full compliance with the law.

54.     In violation of their fiduciary duties, defendants permitted and/or caused Herley to conduct its government contract business in an illegal manner.  Defendants' conduct, as detailed more fully herein, involves a knowing, culpable, and/or reckless violation of their obligations as Directors of Herley, an absence of good faith on their part, and a blatant disregard for their duties to the Company and its shareholders.  Defendants knew or recklessly disregarded the substantial risk of criminal indictment, and economic and reputational injury faced by the Company as a result of the  illegal acts.

**DUTIES OF THE INDIVIDUAL DEFENDANTS**

55.     As directors of a Delaware corporation, defendants were charged with performing their duties in good faith and with the degree of care that an ordinarily prudent person would use under similar circumstances.

56.     Defendants owe to Herley and its shareholders fiduciary duties of loyalty, honesty, care, good faith and oversight.

17

## DERIVATIVE AND DEMAND EXCUSED ALLEGATIONS

57.     Plaintiff incorporates the foregoing paragraphs by reference, as though set forth fully herein.

58.     Plaintiff brings this action derivatively in the right and for the benefit of Herley to redress injuries suffered by Herley as a result of the breaches of fiduciary duty by the Defendants.

59.     Plaintiff will adequately and fairly represent the interests of Herley and its shareholders in enforcing and prosecuting its rights

60.     Plaintiff is now and has been the owner of Herley common stock at times relevant hereto.

61.     As a result of the facts set forth herein, plaintiff has not made any demand on the Herley Board of Directors to institute this action.  Such demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action, for the following reasons:

(a)     The Board of Directors stated publicly in Herley's SEC Form 10-Q that, following the Indictment, "[t]he Company's Board of Directors has retained outside counsel who has conducted an independent investigation and review of the allegations [in the Indictment].  The Board of Directors believes that, based on information currently available to it, no criminal conduct has occurred and the Company will vigorously contest the charges."

(b)     Defendants Blatt and Levy are inside directors.  In addition, the following directors have significant personal and/or professional relationships which would

18

prevent them from investigating or bringing suit against each other for the wrongdoing alleged herein:

(i)     Defendant Thonet, nominated in 1991 is Defendant Blatt's son-in-law;

(ii)    Defendant Bogucz was nominated to the Board in March 2003, is a former dean of Syracuse University and currently serves as Executive Director for Syracuse University's Center for Excellence.  Defendant Blatt and his family have donated over a million dollars to Syracuse University and Defendant Blatt is a trustee of Syracuse University.

(iii)   Defendant Walker was nominated to the Board in 1997 and has, since 1988, worked as a consultant for, *inter alia*, the United States Navy and the Department of Defense.

(c)     Defendants Bogucz and Walker are interested directors, serving on the Compensation and Audit Committee in violation of that committee's charter and due to their profession relationships incapable of making independent decisions concerning compensation, compliance and financial oversight.

(d)     In light of their sustained and systematic failure to fulfill their fiduciary duties, a majority of the Defendants face substantial likelihood of being held liable, and therefore they are incapable of disinterestedly and independently considering a demand to commence and vigorously prosecute this action.

## COUNT I

### AGAINST ALL DEFENDANTS
### FOR BREACH OF FIDUCIARY DUTY

62.    Plaintiff incorporates the foregoing paragraphs by reference, as though set forth fully herein.

63.    Each defendant owed Herley and its shareholders the highest duties of loyalty, honesty, care, good faith and oversight.

64.    At a minimum, to properly discharge these duties, each defendant should have exercised reasonable and prudent supervision and oversight over the management, policies, practices, and controls of Herley.  By virtue of these obligations, each defendant was required, *inter alia*:

(a)    To exercise reasonable control and supervision over the Blatt, the officers, managers, employees, agents, business and operations of Herley; and

(b)    To be and remain informed as to how Herley and Blatt were operating Herley's government contract business.

65.    Defendants knowingly, intentionally or recklessly breached their fiduciary duties by, *inter alia*, failing to prevent the illegal conduct alleged herein and in the Indictment.

66.    Defendants knew of, or were reckless in disregarding the illegal course of conduct alleged herein and in the Indictment.

67.    Defendants took no action in a good faith effort to prevent or remedy the illegal alleged herein and in the Indictment.  Defendants demonstrated a sustained or systemic failure to properly oversee the government contract business of Herley, and a

conscious failure to perform their duties, by ignoring red flag warnings of corporate misconduct and failing to assure implementation of an effective oversight system.

68.     Defendants, by their knowing, intentional or reckless misconduct, caused Herley to suffer criminal indictment, financial harm and impairment of its reputation and credibility for no legitimate business purpose.

69.     Accordingly, plaintiff, as a shareholder of Herley, seeks, on behalf of Herley, monetary damages and equitable relief.

**WHEREFORE**, plaintiff demands judgment as follows:

A.      Against all of the defendants and in favor of Herley for the amount of damages sustained and to be sustained by Herley as a result of defendants' breaches of fiduciary duties;

B.      Granting appropriate equitable relief to remedy defendants' breaches of fiduciary duties;

C.      Requiring defendants to remit to Herley all of their salaries, insider trading profits,  and other compensation received during the relevant time period;

D.      Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses;

E.      Ordering that defendants and those under their supervision and control implement corrective measures, including a system of internal controls and procedures sufficient to prevent the recurrence of acts similar to those complained of herein; and

F.      Granting such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: July 6, 2006                                  Respectfully submitted,

/s/ Deborah R. Gross - DG639
**LAW OFFICES BERNARD M. GROSS, P.C.**
Deborah R. Gross (I.D. No. 44542)
Suite 450, Wanamaker Building
Juniper and Market Streets
Philadelphia, PA 19107
Telephone:  215-561-3600
Fax: 215-561-3000


**LAW OFFICES OF MARC HENZEL**
Marc S. Henzel
273 Montgomery Avenue, Suite 202
Bala Cynwyd, PA 19004
Telephone: 610-660-8000
Fax: 610-660-8080

Attorneys for Plaintiff