IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE DERIVATIVE LITIGATION, HERLEY INDUSTRIES INC. | Civil Action No. 06-2964 |

## VERIFIED CONSOLIDATED DERIVATIVE COMPLAINT

Plaintiffs Michelle Blair and Harvey Houtkin ("Plaintiffs") bring this action derivatively on behalf of nominal defendant, Herley Industries, Inc. ("Herley" or the "Company") and allege upon personal knowledge as to themselves and their own acts, and as to all other matters upon information and belief as follows:

## NATURE AND SUMMARY OF THE ACTION

1.      This is a shareholder derivative action brought by a shareholder of Herley, on behalf of the Company against its directors (the "Individual Defendants") seeking to remedy defendants' violations of federal and state law, including breaches of fiduciary duties, abuse of control, gross mismanagement, waste of corporate assets, and unjust enrichment that occurred between October 2001 and the present (the "Relevant Period") and that have caused substantial losses and other damages to Herley, such as to its reputation and goodwill.

2.      Dating back to at least October 2001, defendants have allowed Lee Blatt ("Blatt"), the founder, former Chief Executive Officer ("CEO"), and Chairman of the Board of Herley (the "Board") to fraudulently bid on United States government military procurement contracts by fabricating manufacturing costs on contracts with the U.S. Department of Defense.

3.      On June 6, 2006, Blatt and the Company were indicted in the United States District Court for the Eastern District of Pennsylvania (the "Indictment") on 29 counts of wire fraud, two counts of obstruction of a federal audit, one count of major fraud against the United States, three counts of making a false statement to the government, and aiding, abetting and causing these violations.   On June 13, 2006, the U.S. government suspended four of Herley's facilities from receiving new contract awards.

4.      Although Blatt was indicted on multiple counts of fraud, obstruction and making false statements, the Board failed to take any action to hold Blatt accountable for his damage to the Company.   Rather, in order to avoid scrutiny of their own misconduct as directors during a time of rampant illegal activity at the Company, the Board elected to terminate Blatt "without cause," despite the fact that Blatt's misconduct permitted a "for cause" termination under the Company's employment agreement with Blatt.   Blatt's termination without cause triggered a golden parachute of nearly $9.5 million for which the Company would not have been responsible under a for cause termination.   The Individual Defendants also agreed to grant Blatt a general release of any claims Herley might have against him, so as to avoid any further proceedings that might expose the Individual Defendants to liability for their own misconduct.

5.      Indeed, in furthering the cover-up of their own misconduct, the Individual Defendants also took steps to limit the scope of the investigation that had been proposed by the Company's outside auditor, BDO Siedman, LLP ("BDO").   In response to the Individual Defendants' refusal to comply with the requirements of BDO's investigation, BDO resigned as the Company's auditors, inflicting further damage on Herley.   The

Individual Defendants thereafter tried to cover-up any disclosure of the basis of BDO's resignation, prompting BDO to take the unusual step of proceeding with a "noisy withdrawal" and directly notifying the SEC that Herley's disclosure of the resignation was not accurate. Indeed, the Individual Defendant's willingness to stonewall and fail to provide information and documentation to government investigators was noted in a report by the Department of Defense, which determined that the Company had provided "inadequate and insufficient" information and failed to address the misconduct at Herley or otherwise ensure that Herley maintained appropriate standards of ethics and integrity.

6.      Defendants' improper conduct has caused and will continue to cause serious damage to Herley and its public shareholders, including, the loss of its reputation and goodwill, the costs of defense of the indictment and the costs associated with the numerous shareholder class action lawsuits filed against Herley and its senior officers. Nonetheless, the Individual Defendants have taken steps to prevent the Company from recouping these damages from Blatt, as the Board agreed to grant Blatt a general release, in order to foreclose any legal action against Blatt that would implicate the misconduct of the Individual Defendants.

## JURISDICTION AND VENUE

7.      This shareholder derivative action is brought pursuant to Fed. R. Civ. P. 23.1.

8.      Herley is a Delaware corporation with its headquarters in Lancaster, Pennsylvania. Plaintiffs are residents of Kansas and Florida. The defendants are residents of states other than Kansas and Florida.

9.     This Court has diversity jurisdiction over this action pursuant to 28 U.S.C. §1332, because the amount in controversy exceeds $75,000, exclusive of interest and costs.

10.     This action is not brought collusively to confer jurisdiction on this Court which it would not otherwise have.  Herley is headquartered in this Judicial District, and the Company and the defendants are subject to personal jurisdiction in this Judicial District.  Venue is proper here because the claims herein arose fom events, actions and failures to act which occurred in this Judicial District.

## THE PARTIES

11.     Plaintiff Michelle Blair is and was at times relevant hereto, an owner and holder of Herley common stock.  Plaintiff Michelle Blair is a resident of Kansas.

12.     Plaintiff Harvey Houtkin is and was at times relevant hereto, an owner and holder of Herley common stock.  Plaintiff Harvey Houtkin is a resident of Florida.

13.     Nominal Defendant Herley is a Delaware corporation with its principal executive offices at 101 North Pointe Boulevard, Lancaster, Pennsylvania 17601.  Herley designs, develops and manufactures microwave technology solutions for the defense, aerospace and medical industries worldwide.

14.     Defendant Blatt is a founder of Herley and, prior to his resignation on June 8, 2006, had been Chairman of the Company's Board of Directors (the "Board") since Herley's formation in 1965.  Although holding only the title of Chairman, Blatt was considered an officer and member of Herley management.   Blatt is a resident of Massachusetts.

15.     Defendant Myron Levy ("Levy") has been a director of Herley since 1992, Vice Chairman since August 2003, and Chief Executive Officer of the Company since August 2001.   Levy also served as Herley's President from 1993 to 2001, Executive Vice President and Treasurer from 1991 to 1993, and as Vice President for Business Operations and Treasurer from 1988 to 1991.   Levy was appointed Chairman of the Board upon Blatt's resignation on June 8, 2006.   Levy has also been a director of NetWolves Corporation ("NetWolves") and Chairman of its Audit Committee since 2003.  Levy is a resident of Pennsylvania.

16.     Defendant John A. Thonet ("Thonet") has been a director of Herley since 1991, and is also the Company's Secretary.   Although holding only the title of Secretary and a director, Thonet is considered an officer and member of Herley management. Thonet is the son-in-law of Blatt.  Thonet is a resident of New Jersey.

17.     Defendant Edward A. Bogucz ("Bogucz") has been a Director of Herley since 2003, and serves on the Board's Compensation Committee (as Chairman) and Nominating Committee.  Bogucz is a resident of New York.  Bogucz has a longstanding personal and social relationship with Blatt.  Bogucz has been a professor at the College of Engineering & Computer Science at Syracuse University ("SU") since 1985, and served as Dean between 1995 and 2003.   Herley's proxy statements describe Bogucz's experience at SU: "As Dean, he led the strengthening of the College of Engineering and Computer Science in selected areas, including RF and microwave devices[.]"  Defendant Blatt and his wife, Sydelle Schnall Blatt, are graduates of SU, were married during their senior year at SU, and have many family members as SU alumni, including two daughters, Kathi Blatt Thonet and Randi Blatt Rossignol, their son-in-law, defendant

Thonet, cousin Sondra Gerson Godfrey, niece Stacey Greenberg, and granddaughters Hannah Blatt Thonet and Rebecca Blatt Thonet.   Blatt is also a Trustee of SU and has made large contributions to SU.   In particular, Blatt has supported Bogucz's pet projects in RF and microwave device programs.   Blatt had already established the Harry Blatt Memorial Scholarship in Applied Science for students pursuing degrees in engineering and computer science, when, Bogucz in 2001 awarded Blatt the "Dean's Outstanding Alumni Award."   In connection with Bogucz's presentation of the Outstanding Alumni Award to Blatt, Blatt then established two scholarships at SU.   According to SU's alumni materials:

> [Blatt] and his wife, Sydelle Schnall Blatt '51, have supported the RF Wireless/ Microwave Engineering program in the L.C. Smith College of Engineering and Computer Science and have established two scholarships at the University.   In honor of Blatt's father, the couple established the Harry Blatt Memorial Scholarship in Applied Science, which benefits juniors and seniors pursuing a degree in engineering and computer science.   The couple also established the Sydelle and Lee Blatt Scholarship, which is awarded each year to undergraduate students studying social sciences.

18.   Defendant Carlos Campbell ("Campbell") has been a Director of Herley since 2005, and serves on the Board's Nominating Committee (as Chairman) and Corporate Governance Committee.   Campbell has also been a director of NetWolves and a member of its Audit Committee since 2003, such that Campbell and Levy have interlocking directorships.   Indeed, after 2 years of directorship of NetWolves, Levy brought Campbell over to Herley in 2005.   Campbell formerly was an officer in the U.S. Navy, served in the Commerce Department during the Reagan administration, and is currently managing director of a consulting firm that specializes in government relations. Campbell is a resident of Virginia.

19.     Defendant Edward K. Walker, Jr. ("Walker") has been a Director of Herley since 1997 and serves on the Board's Audit Committee (as Chairman), Compensation Committee, Nominating Committee and Corporate Governance Committee (*i.e.*, every one of the Board's standing committees).   Walker retired from the U.S. Navy in 1988, after 34 years as an Officer in various positions, including Commander of the Naval Supply Systems Command and Chief of Supply Corps.   Walker is a resident of Virginia.

20.     Defendant Robert M. Moore ("Moore") has been a Director of Herley since 2003, and serves on the Board's the Audit Committee, Compensation Committee and Corporate Governance Committee.   Moore retired from the U.S. Navy after 35 years of service, his last assignment being head of the Navy's worldwide supply system. Moore is a resident of Pennsylvania.

21.     Defendants Blat, Levy, Thonet, Bogucz, Campbell, Walker and Moore are referred to collectively herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

22.     By reason of their positions as officers and/or directors and fiduciaries of Herley and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed Herley and its shareholders fiduciary obligations of trust, loyalty, good faith and due care, which was and are required to use their utmost ability to control and manage Herley in a fair, just, honest and equitable manner.   The Individual Defendants were and are required to act in furtherance of the best interests of Herley and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

23.     Each director and officer of the Company owes to Herley and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company, in the use and preservation of its property and assets, and to uphold the highest obligations of fair dealing.   In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's management and operations so that the market price of the Company's stock would be accurate.

24.     During the relevant period, the Individual Defendants, as senior executive officers and/or directors of Herley, were privy to confidential and proprietary information concerning the Company, its operations, finances, financial condition, and present and future business prospects via access to internal corporate documents, conversations and connections with other corporate officers and directors, attendance at management and/or Board meetings and committees thereof..   The Individual Defendants also had access to material, adverse, non-public information concerning Herley.    Because of their possession of such information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were in fact being concealed from, the investing public.

25.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Herley, and was at all times acting within the course and scope of such agency.

26.     To discharge their duties, the Individual Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices and

controls of the financial affairs of the Company.   By virtue of such duties, the Individual Defendants were required to, among other things:

a.      Ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

b.      Remain informed as to how Herley conducted its operations and, upon receipt of notice or information of imprudent or illegal conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws; and

c.      Ensure that the Company was operated in a diligent, honest and prudent manner in compliance with all applicable federal, state and local laws, rules and regulations.

27.      Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.   The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Herley, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

28.     The Individual Defendants breached their duties of loyalty and good faith by allowing defendant Blatt and other company employees to engage in a scheme to defraud the U.S. government and to obtain approximately $3,934,203 in money and property by means of false and fraudulent pretenses, representations and promises.

29.     As a result, in June 2006, Herley was suspended from receiving consideration for government contracts at four of their nine locations.  Herley lost over a third of the value of it's stock and will incur significant costs in investigating and defending the Company and the Individual Defendants.  Subsequently in October 2006, Herley reached an administrative agreement with the OGC Acquisition Integrity Office which lifted the suspension.

30.     Moreover, these actions have irreparably damaged Herley's corporate image and goodwill.  For at least the  foreseeable future, Herley will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that Herley's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

31.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breach of their respective duties.

32.     During all times relevant hereto, the Individual Defendants collectively and individually initiated a course of conduct that was designed to and did: (i) deceive the investing public regarding Herley's business, operations and management, and the intrinsic value of Herley's securities; (ii) enable the Company to complete a public offering of its common stock which reaped approximately $69 million in gross proceeds; (iii) maintain the Individual Defendants' executive and directorial positions at Herley and the profits, power and prestige that the Individual Defendants enjoyed as a result of these positions; and (iv) deceive the shareholders of Herley, regarding the business and prospects for business of the Company.  In furtherance of this plan, conspiracy and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.

33.     The Individual Defendants engaged in a conspiracy, common enterprise and/or common course of conduct.  During this time the Individual Defendants caused the Company to conceal the true fact that Blatt and other Herley employees were defrauding the U.S. government.

34.     The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment.

35.     The Individual Defendants accomplished their conspiracy, common enterprise and/or common course of conduct by causing the Company to purposefully, recklessly or negligently misrepresent its business operations and financial results.

36.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.   In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

### SUBSTANTIVE ALLEGATIONS

37.     During the period commencing approximately April 2000 and continuing through until approximately December 2002, Herley and Blatt engaged in "a scheme to defraud the U.S. government and one of its prime contractors, Lockheed Martin, and to obtain money and property, that is approximately $3,934,203, by means of false and fraudulent pretenses, representations and promises." Indictment, ¶21.

38.     The illegal course of conduct permeated Herley, involving four major facilities in Lancaster, Pennsylvania, Woburn, Massachusetts, Chicago, Illinois and Farmingdale, New York and three major U. S. Government contracts involving voltage controlled oscillators and Power Heads.   The equipment manufactured and sold by Herley were critical components of the F-16 fighter jet radar systems and E-2c Hawkeye aircraft and were components manufactured only by Herley.   Thus, Herley was the only company from which the Air Force could buy VCO's and from which the Navy could buy Power Heads.

39.     Government purchase contracts, including those by the military, were governed by federal procurement regulations, called the Federal Acquisition Regulations (or the "FAR").

40.     Where there was one supplier of a product (so-called "sole-source" procurements), the military did not engage in a competitive bidding process, but rather initiated its procurement by soliciting a bid directly from the supplier.

41.     For each contract at issue in this indictment, the military used a type of contract known as a "firm fixed price contract." Under a firm fixed price contract, for the entire term of the contract, the price to be paid for the product is fixed at the time the parties enter the contract: changed circumstances which increase or decrease costs will not change the contract purchase price, that is, the contract price is settled (firm) and unchanging (fixed).

42.     The contracting process for a firm fixed contract between the military and a sole source supplier was as follows: A civilian employee of the Navy or Air Force with procurement responsibilities (sometimes called a "contracting officer") issued a request for a proposal ("RFP"), which solicited a quotation or bid from Herley for the needed product. In the procurements at issue here, the employee sent that RFP to the Herley division that purchased the VCO's or the Power Heads. In response, if Herley wanted the contract, its division would submit a quotation for the solicited product. With its quotation, the military required Herley to submit a cost breakdown, that is, an explanation and justification of the quotation Herley gave the military, as well as a cover sheet, called the Standard Form ("SF") 1411.

43.     Federal regulations required that the quotation and analyses submitted by a bidder such as Herley were to be based on the company's prior experience, modified, if necessary, by any changed circumstance or reasonably believed likely changed

circumstance, that is, by reasonable estimates.  The contractor's prior experience was called its "historical" data.

44.     From April 2000 through in or about December 2002, the Individual Defendants were aware or should have been aware that Blatt dictated the amount of the fraudulent quote and support used to justify it, that Blatt dictated that Herley represent that obsolescence required a new manufacturing process, that Blatt dictated an amount of a fraudulent quotation for the part to be purchased intra-company and that as a result of Herley's selling these products at vastly increased prices and using the same parts and methods to manufacture it had always had used, Herley had profit in excess of 250% of its costs on one component and 300% on another.

45.     In 2001 during an audit of the Company, the Department of Defense found some discrepancies in Herley's prices for VCO's and Power Head.

46.     In a pre-award audit, the government's auditors reviewed the bid proposal submitted by the contractor against the contractor's historical data, and examined the reasonableness of the contractor's estimates, as well as any other assumptions which it had incorporated into its bid.  The pre-award audit served to ensure that, even though there was no competition for the contract, the bid price was reasonable and justified on the basis of past experience (historical data).  The auditor typically gave an initial oral summary of his or her findings to the procurement specialists, and later issued a final report.

47.     After the pre-award audit, the parties entered into final negotiations. One of the responsibilities of the military's negotiator, the contracting officer, was to

determine whether the company's anticipated profits were reasonable in light of the relative risk taken in entering into the contract.

48.     When the parties reached agreement, whether oral or in writing, about the terms of the contract, the contractor's negotiator sent a confirming letter setting forth the agreed-upon price.   At the same time, the contractor executed and presented to the government with this confirming letter a Certificate of Current Cost and Pricing Data.

49.     The military required the contractor under a sole source contract of over $500,000 to sign a Certificate of Current Cost and Pricing Data.

50.     The Certificate of Current Cost and Pricing Data, like the SF 1411, attested that the information supplied by the contractor, on the basis of which the military negotiated the contract price, was current, accurate and complete.   It provided:

> This is to certify that, to the best of my knowledge and belief, the cost or pricing data...submitted, either actually or by specific identification in writing, to the contracting officer or the contracting officer's representative in support of [the solicitation] are accurate, complete and current as of [date of agreement].

51.     The Individual Defendants were aware of the importance of being honest and providing accurate information in order to be awarded government contracts, particularly given the fact that Herley was so heavily dependant on government contracts. Nonetheless, between 2000 through June 5, 2006, defendants took no action to remedy the illegal conduct or to discipline or take any action against those persons at Herley who participated in the illegal conduct, choosing instead to stonewall and otherwise, failed to cooperate with government investigators.

52.     Defendants, by reason of their positions as the directors of the Company, and in accordance with applicable law, have a fiduciary duty to act in good faith in

controlling, managing, overseeing and directing the business, operations and management of Herley to insure that their operations and activities are in full compliance with federal and state laws and regulations, under which the Company operate.  Defendants, by reason of their knowledge and recklessness, as alleged herein, failed to act in good faith throughout the period of the wrongdoing engaged in by the Company and the Chairman of the Board of Directors of Herley, as alleged herein and in the Indictment, and permitted the illegal and fraudulent conduct to continue over a period of years and to go undisclosed and unremedied for a longer period of years.

53.     Indeed, as sophisticated business people with extensive executive and management experience in publicly traded companies and in the defense industry in particular, the Individual Defendants were each aware of basic concepts of internal controls as applied to complex business organizations, as well as of the importance of adequate and effective systems to ensure corporate compliance with applicable laws and regulations.

54.     Although armed with knowledge of or access to the facts concerning the Company's government contracts, the Company's illegal conduct and Blatt's role, the Directors did not, over the continuing period of time from 2000 to June 2006, take any effective steps to ensure that Herley's government contract business was conducted in full compliance with the law, and instead sought to stonewall investigations conducted by the Department of Defense and proposed by its outside auditor.

55.     In violation of their fiduciary duties, the Individual Defendants permitted and/or caused Herley to conduct its government contract business in an illegal manner. The Individual Defendants' conduct, as detailed more fully herein, involves a knowing,

culpable, and/or reckless violation of their obligations as directors of Herley, an absence of good faith on their part, and a blatant disregard for their duties to the Company and its shareholders.  The Individual Defendants knew or recklessly disregarded the substantial risk of criminal indictment, and economic and reputational injury faced by the Company as a result of the illegal acts.

56.    Moreover, prior to and following the public disclosure of Blatt's indictment on June 6, 2006, the other Individual Defendants sought to cover up their own misconduct, by failing to provide complete information to government investigators, by attempting to obstruct the investigation of the Company's outside auditor and by granting a large golden parachute and general release to Blatt.

57.    On May 9, 2006 (prior to the Indictment) and June 7, 2006 (one day after the Indictment), members of the Board (other than Blatt) met with representatives of the Department of Defense, after being notified that Blatt would be  indicted and that Herley might also be indicted.  The June 9, 2006 Department of Defense report of the meetings noted the Board members' failure to provide information or documentation concerning the Power Heads, stating that Herley "did not provide substantive information addressing the [Power Head] contracts" and "did not provide any documentation supporting the obsolescence or costs relating to the power heads."  The Department of Defense report determined that:

> Herley Industries provided limited information addressing the circumstances that gave rise to the misconduct… Herley Industries provided no factual information or explanation with respect to the power head contracts… In light of the information provided by Herley Industries, Herley Industries has not met its burden of adequately addressing the circumstances…

With respect to Herley Industries' standards of ethics and integrity and their implementation… ***the information provided by Herley Industries cannot support a determination that "appropriate standards of ethics and integrity are in place and working" as required***…

\* \* \*

***<u>The information provided by Herley Industries is inadequate and insufficient</u> to support a determination that Herley Industries has addressed adequately the circumstances that gave rise to the misconduct and that appropriate standards of ethics and integrity are in place and are working.***  [Emphasis added.]

58.    Blatt formally resigned as Chairman of the Board on June 8, 2006, and, rather than choose a director independent of management as Chairman, the other Individual Defendants instead choose Levy – a member of Herley management who worked for Blatt for over 18 years – as Chairman.

59.    The terms of Blatt's employment at Herley were set by a July 29, 2002 employment agreement (as amended December 9, 2003), that permits Blatt's termination "for cause" in the event of a (i) felony conviction involving acts of dishonesty for personal gain and harm to Herley and/or (ii) in the event of Blatt's willful, continued failure to perform his duties and harming Herley.  Blatt's illegal actions that resulted in his indictment and prevented him from continuing to perform his duties at Herley, and harmed Herley, thus triggering a for cause termination even without awaiting a criminal conviction.  Under the employment agreement, a for cause termination would result in the Company's payment to Blatt of only any salary and bonus up until the date of termination, plus any unused vacation credit.  Termination without cause, however, would trigger a lucrative golden parachute payment that includes full salary and bonus payments for the remainder of the term of employment to December 31, 2015, valued at nearly $9.5 million.

60.     Rather than elect a for cause termination, the Individual Defendants elected to terminate Blatt without cause, thus triggering the $9.5 million golden parachute, although Blatt agreed to accept a $3 million lump sum and $6.5 million paid over the next five years.  However, the golden parachute itself is inflated, as it is based on salary and bonus calculations that were falsely inflated by financial results achieved only through Blatt's misconduct.  Indeed, nearly two months before the Individual Defendants agreed to award Blatt the golden parachute based on, among other things, the Company's financial results for its fiscal year ended June 30, 2005, Herley's outside auditor, BDO, formally withdrew its clean audit opinion for the Company's fiscal 2005 financial statements.  Amazingly, in addition to the golden parachute, the Individual Defendants also awarded Blatt an "***incentive*** bonus" and a "***discretionary*** bonus (emphasis added) for the fiscal year ended July 31, 2006 ***even though Blatt had resigned from the Company weeks earlier***.

61.     In addition, despite valuable claims against Blatt for the massive damage he has inflicted on Herley, the Individual Defendants agreed to grant Blatt a general release that prevents any further action against Blatt (absent this litigation) that might implicate the misconduct of the Individual Defendants.

62.     Essentially, the Individual Defendants approved the scenario whereby Blatt submits false documents to the Department of Defense, which serve to falsely inflate Herley's financial results; Blatt gets paid salary and bonuses each year based on the financial results he falsely inflated; when Blatt is caught and fired from the Company, Blatt gets to keep not only all the inflated salary and bonuses he was wrongly awarded (by his loyal SU professor, Bogucz, Chairman of the Compensation Committee), but also

gets a golden parachute based on those same falsely inflated past salary and bonuses; and, finally, Blatt gets a general release from the Company.  By approving this scenario, the Individual Defendants sought to eliminate anything that might bring to light their own liability for the illegal acts at Herley.

63.     That the Individual Defendants attempted to avoid anything that might shed light on their own culpability is also seen in their efforts to limit the scope of the investigation demanded by the Company's outside auditor, BDO.

64.     Following disclosure of the Indictment on June 6, 2006, BDO notified Herley that BDO would not be able to complete its review of the Company's most recent quarterly financial statements, and that, as the Company's outside auditor, BDO would require that the Company undertake an investigation of the conduct underlying the Indictment and provide BDO with access to the results of that investigation.  BDO provided the Company with specific parameters of the investigation that would meet BDO's requirements as outside auditor.

65.     The Individual Defendants, however, refused to accept BDO requirements, and instead sought to limit the scope of the investigation and find a new auditor willing to accept a more limited investigation.  After much stonewalling from the Individual Defendants, BDO formally resigned as Herley's outside auditor on July 27, 2006.

66.     The Individual Defendants again took steps to cover-up the reason for BDO's resignation as the Company's refusal to comply with BDO's required investigation.  On July 27, 2006, the Company notified the SEC that BDO had abruptly

resigned on July 27, 2006 "without any prior notification to either the Company and its counsel."

67.    The Company's statements to the SEC prompted BDO to take the unusual step of issuing a "noisy withdrawal," by notifying the SEC on August 14, 2006 that the Company had falsely represented the circumstances surrounding BDO's resignation. BDO informed the SEC that the resignation was actually the result of the Company's attempt to restrict the scope the investigation required by BDO, and that, as a result thereof, BDO was no longer able to rely on management's representations:

> On several occasions prior to our resignation, including in writing on June 26, 2007, we provided a clear indication of the nature of the independent investigation that would be required, and the conditions of our access to the results of such investigation, in order for us to remain the independent registered public accountant for the Company.  Repeated attempts by the Company to reduce the scope of such investigation concluded with a meeting on July 24, 2006 between representatives of BDO Seidman, LLP and the firm that had been hired to perform an independent investigation. Following that meeting, *we concluded that no such independent investigation acceptable to us was going to be performed due to apparent limitations on the scope of the investigation…*
>
> *As a result of the lack of responsiveness to our request regarding the scope of the independent investigation, we believe we are no longer able to rely on the representations of management provided to date.* Accordingly *we have withdrawn our opinion on the Company's financial statements for the year ended June 30, 2005*.  In addition, pursuant to the procedures  required by Section 10A(b)(2) of the Securities Exchange Act of  1934, *we concluded that the scope of the independent investigation of the alleged  illegal acts as contemplated by the Company would not be sufficient to allow BDO to determine either the impact of the alleged illegal acts on the financial  statements of the Company or identify the potential  involvement of other Company personnel involved in the accounting and  financial reporting function* due to the attorney-client privilege limitations that were being imposed.  Accordingly, in the circumstances, *we were and are unable to conclude that the Company was taking timely and appropriate remedial actions with respect to the alleged illegal acts.*  [Emphasis added.]

68.     Significantly, BDO's interactions with respect to the investigation were directly with the Board's Audit Committee and its representatives.  At the time, the Audit Committee consisted of defendants Bogucz, Walker and Moore.

### DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

69.     Plaintiffs brings this action derivatively in the right and for the benefit of Herley to redress injuries suffered, and to be suffered, by Herley as a direct result of the breaches of fiduciary duty by the Individual Defendants.  Herley is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

70.     Plaintiffs will adequately and fairly represent the interests of Herley in enforcing and prosecuting its rights.

71.     Plaintiffs are and were owners of Herley stock during times relevant to the Individual Defendants' wrongful course of conduct alleged herein, and remain shareholders of the Company.

72.     Plaintiffs have not made any demand on the present Board of Herley to institute this action because such a demand would be a futile, wasteful and useless act, because the Individual Defendants suffer from disabling conflict that prevent them from considering demand:

        a.     Defendant Blatt has been indicted for the misconduct identified herein and is hopelessly conflicted;

        b.     Defendants Blatt, Levy and Thonet were all senior members of Herley management during the time of the misconduct alleged herein, and face a substantial likelihood of liability for their breaches of fiduciary duty;

c.      Defendant Thonet is Blatt's son-in-law and cannot act independently with respect to a demand to hold Blatt liable for Blatt's misconduct at the Company;

d.      Defendant Bogucz, having spent over 20 years at SU, is a direct beneficiary of Blatt's financial contributions to SU and Bogucz's pet projects at SU, for which Bogucz has rewarded Blatt with an Outstanding Alumni Award, such that Bogucz cannot consider a demand to hold Blatt liable for Blatt's misconduct at the Company;

e.      Defendant Campbell, as an interlocking director with Levy and member of the NetWolves Audit Committee chaired by Levy, and having been brought over to Herley by Levy, cannot consider a demand to hold Levy and the other members of Herley management liable for their misconduct at the Company;

f.      Defendants Bogucz, Walker and Moore, as members of the Compensation Committee, cannot reasonably consider a demand because they awarded lucrative compensation packages to Blatt at the same time Blatt was engaging in illegal activity, defrauding the U.S. government, and severely damaging the Company.   In the years 2001 through 2005, the Compensation Committee approved salary and bonus for Blatt of $635,759, $1,825,325, $1,686,835, $2,002,130, and $1,481,111, respectively. Due to their poor oversight, defendants Bogucz, Walker and Moore are conflicted and face a substantial likelihood of liability for their breaches of fiduciary duty to Herley;

g.      Defendants Bogucz, Walker and Moore, as members of the Audit Committee, are responsible under the Audit Committee's charter, for "reviewing, on a continuing basis, the adequacy of the Company's system of internal controls."   Herley's internal controls, however, were woefully deficient, as evidenced by the uninhibited

illegal activity that was occurring at Herley.   As discussed *infra*, these Audit Committee directors also refused to cooperate with requests from BDO.   Herley has been damaged as a result of the stunning lack of oversight by defendants Bogucz, Walker and Moore, such that these defendants are conflicted and face a substantial likelihood of liability for their breaches of fiduciary duty to Herley;

    h. Defendants Walker, Moore and Campbell, as members of the Corporate Governance Committee, are responsible under the Corporate Governance Committee charter for "monitoring developments in corporate governance principles and other corporate governance matters and making recommendations to the Board of Directors regarding the adoption of additional corporate governance principles."   These defendants, however, utterly failed in their monitoring of the Company's inadequate corporate governance, which permitted Blatt's misconduct to continue until his indictment was unsealed.   Indeed, although charged with monitoring and making recommendations with respect to corporate governance, and the importance of good corporate governance in a Company focused on government contracts, the Corporate Governance Committee met only once a year.   Herley has been damaged as a result of the stunning lack of oversight by defendants Walker, Moore and Campbell, such that these defendants are conflicted and face a substantial likelihood of liability for their breaches of fiduciary duty to Herley;

    i. Defendants Levy, Moore and Thonet are conflicted and cannot reasonably consider demand, because these defendants are beholden to the members of the Nominating Committee, defendants Campbell, Walker and Bogucz, who are responsible for identifying and evaluating these individuals for selection to the Board of

Directors and all the perquisites and benefits that flow therefrom.   Campbell, Walker and Bogucz, however, face a substantial likelihood of liability as a result of their own misconduct as alleged herein, and are in a position to refuse to nominate Levy, Moore and Thonet as directors of the Company, such that Levy, Moore and Thonet are conflicted and cannot reasonably consider demand.

73.   Indeed, all the Individual Defendants, because of their inter-related business, professional and personal relationships, have developed debilitating conflicts of interest that prevent the Board members of the Company from taking the necessary and proper action on behalf of the Company as requested herein.   The majority of the Board, including the defendants listed below, are subject to the following prejudicial entanglements:

a.   Each of the Individual Defendants knew of and/or directly benefited from the wrongdoing complained of herein;

b.   The Individual Defendants, as more fully detailed herein, participated in, approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from Herley's stockholders or recklessly and/or negligently disregarded the wrongs complained of herein, and are therefore not disinterested parties;

c.   In order to bring this suit, all of the directors of Herley would be forced to sue themselves and persons with whom they have extensive business and personal entanglements, which they will not do, as evidenced by their approval of the Release to Blatt, thereby excusing demand;

d.      The acts complained of constitute violations of the fiduciary duties owed by Herley's officers and directors and these acts are incapable of ratification;

e.      Herley has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Individual Defendants and current Board have not filed, nor will they file, any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Herley any part of the damages Herley suffered, as evidenced by the approval of the Release to Blatt, and will suffer thereby; and

f.      If Herley's current and past officers and directors are protected against personal liability for their acts of mismanagement, abuse of control and breach of fiduciary duty alleged in this Complaint by directors' and officers' liability insurance, they caused the Company to purchase that insurance for their protection with corporate funds, *i.e.*, monies belonging to the stockholders of Herley.  However, due to certain changes in the language of directors' and officers' liability insurance policies in the past few years, the directors' and officers' liability insurance policies covering the defendants in this case contain provisions that eliminate coverage for any action brought directly by Herley against these defendants, known as, *inter alia*, the "insured versus insured exclusion."  As a result, if these directors were to sue themselves or certain of the officers of Herley, there would be no directors' and officers' insurance protection and thus, this is a further reason why they will not bring such a suit.  On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate recovery.  If there is no directors' and

officers' liability insurance at all then the current directors will not cause Herley to sue them, since they will face a large uninsured liability.

## COUNT I

### Against All Defendants for Breach of Fiduciary Duty

74.     Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

75.     The Individual Defendants owed and owe Herley fiduciary obligations. By reason of their fiduciary relationships, these defendants owed and owe Herley the highest obligation of good faith, fair dealing, loyalty and due care.

76.     The Individual Defendants, and each of them, violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

77.     Each of the Individual Defendants had actual or constructive knowledge that they had caused or allowed the Company to defraud the U.S. government.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

78.     As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, Herley has sustained significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

79.     Plaintiffs, on behalf of Herley, have no adequate remedy at law.

## COUNT II

### Against All Defendants for Unjust Enrichment

80.     Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

81.     By their wrongful acts and omissions, Individual Defendants were unjustly enriched at the expense of and to the detriment of Herley.

82.     Plaintiffs, as shareholders and representatives of Herley, seek restitution from these defendants, and each of them, and seek an order of this Court disgorging all profits, benefits and other compensation obtained by the Individual Defendants, and each of them, from their wrongful conduct and fiduciary breaches.

83.     Plaintiffs, on behalf of Herley, have no adequate remedy at law.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment as follows:

A.     Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment;

B.     Directing Herley to take all necessary actions to reform and improve their corporate governance and internal procedures to comply with applicable laws and to protect Herley and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place  before shareholders for a vote for Corporate

Governance Policies that include: (i) a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board; (ii) a provision to permit the shareholders of Herley to nominate at least three candidates for election to the Board; and (iii) tests to strengthen the internal audit and control functions;

C.      Extraordinary equitable and/or injunctive relief as permitted by law, equity and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on or otherwise restricting the proceeds of any golden parachute payments to Blatt and rescinding any Herley release of claims against Blatt, so as to assure that Plaintiffs on behalf of Herley have an effective remedy;

D.      Awarding to Herley restitution from the Individual Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the Individual Defendants;

E.      Awarding to Plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury.

Dated: January 12, 2007

**LAW OFFICES BERNARD M. GROSS, P.C.**

By:     s/ Deborah R. Gross- DG639

     Deborah R. Gross (ID No. 44542)
Suite 450, Wanamaker Building
100 Penn Square East
Juniper and Market Streets
Philadelphia, Pennsylvania 19107
Tel: 215-561-3600
Fax: 215-561-3000

**GARDY & NOTIS, LLP**
Mark C. Gardy (*pro hac vice*)
James S. Notis
440 Sylvan Avenue, Suite 110
Englewood Cliffs, New Jersey 07632
Tel: 201-567-7377
Fax: 201-567-7337

**FARUQI & FARUQI, LLP**
Jacob A. Goldberg (ID No. 66399)
P.O. Box 30132
Elkins Park, Pennsylvania 19027
Tel: 215-782-8235
Fax: 215-782-8236

***Co-Lead Counsel for Plaintiffs***

**FARUQI & FARUQI, LLP**
Nadeem Faruqi
Kara L. Marsallo
320 East 39th Street
New York, New York 10016
Tel: 212-983-9330
Fax: 212-983-9331

**LAW OFFICES OF MARC HENZEL**
Marc S. Henzel
273 Montgomery Avenue, Suite 202
Bala Cynwyd, Pennsylvania 19004
Tel: 610-660-8000
Fax: 610-660-8080

*Counsel for Plaintiffs*